Filed 9/14/15  P. v. Nunez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066241 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS259796) |
| ANGEL MICHAEL NUNEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Edward P. Allard III, Judge.  Affirmed with directions.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Angel Michael Nunez of the second degree murder of Juan Navarro (Pen. Code, § 187, subd. (a))[1] and the assault with a deadly weapon of Venus Sanchez (§ 245, subd. (a)(1)). The jury also found true the allegations that Nunez personally used a deadly and dangerous weapon in the commission of the murder (§ 12022, subd. (b)(1)), and that he committed both the murder and the assault for the benefit of and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).

On the murder conviction and related findings, the trial court sentenced Nunez to prison for an indeterminate term of 15 years to life, plus an additional year, plus a 15-year parole eligibility. On the assault conviction and related finding, the trial court sentenced Nunez to prison for a determinate nine-year term. The sentences are to run consecutively with the 10-year determinate term to be served first. Nunez timely appealed.

Nunez raises two issues on appeal. First, he contends the record does not contain substantial evidence to support the conviction of an assault with a deadly weapon. Second, he asks that the abstract of judgment be corrected in two regards: (1) it should reflect that the direct victim restitution that was ordered is a joint and several obligation of Nunez and his codefendant Alex Flores Rubio; and (2) it should not reflect that Nunez's conviction of section 245, subdivision (a)(1) is a violent felony. Because the record contains substantial evidence that Nunez acted in a manner that would naturally and probably result in a battery, Nunez did not meet his burden of establishing reversible

---

[1]     Further undesignated statutory references are to the Penal Code.

error.  Because the abstract of judgment does not accurately reflect the court's sentencing orders, it should be corrected as requested.  Accordingly, we will modify and affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

We review the record and recite the facts in a light most favorable to the judgment. (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.)

A.      *Gang Associations and Background*

Nunez was — and had been since age 12 — a member of the Otay criminal street gang; his gang moniker was "Conejo" or "Little Rabbit."[2]  Neither Juan Navarro (Juan),[3] the murder victim, nor Sanchez, the assault victim, was a member of a gang, but members of Sanchez's family were associated with the Varrio Chula Vista (VCV) criminal street gang.  Sanchez's friend, Gabby, was a member of the VCV gang.  Otay and VCV are rival gangs.

One day in or around July 2012, Gabby went to pick up Sanchez from her job at a fast food restaurant in Chula Vista.  From inside, Sanchez could see Gabby outside talking with a customer and his two male friends whom Sanchez had just served.  Upon completing her shift, Sanchez went outside, where she witnessed Gabby and the customer

---

[2]      Conejo means "rabbit" in Spanish.

[3]      Three Navarro brothers are involved in this case:  the murder victim, Juan; Sanchez's boyfriend, Jesus Navarro (Jesus); and a driver, Miguel Navarro (Miguel).  We will use first names for clarity and intend no disrespect.

yelling at each other. Gabby explained to Sanchez that the customer, whom Gabby had identified as Nunez, was a member of the Otay gang. Knowing that Gabby was a member of the rival VCV gang and that Gabby's young child was in the car, Sanchez wanted the two women to leave quickly. They did so, but not before Gabby flashed a gang sign, Nunez put on sports gloves (which indicated to Sanchez that she and Gabby "might get hit"), and Nunez's two friends yelled "fuck Chupa" (which Sanchez understood was directed to VCV) and their gang monikers. Sanchez and Gabby safely escaped.

B.     *First Incident — September 25, 2012, 5:00 p.m. At the Bus Stop*

At approximately 5:00 p.m. on September 25, 2012, while Sanchez was waiting for a bus in Chula Vista, Nunez and two male passengers drove up to the bus stop. Nunez — holding an open butterfly-style knife[4] in his right hand by his side — left the car and came directly toward Sanchez. He lifted his hat and asked her whether she recognized him; she did not. After Nunez then said " 'I am Conejo from Otay,' " Sanchez recognized him from the incident at the fast food restaurant two months earlier.

Nunez had approached Sanchez in such an aggressive manner that she begged him not to stab her. He did not, instead slapping her across the face with "all his force," causing her lip piercing and earrings to come out and her face to swell. Nunez's two

---

[4]     A Chula Vista police officer and gang expert described a butterfly knife as a weapon that opens up in the middle into two handles that come down and attach to each other in a locked position, leaving a knife blade exposed in the middle pointing away from the attached handles.

4

friends yelled "fuck Chupa" and told Nunez to return to the car; he called Sanchez a bitch, and the three men drove away leaving Sanchez at the bus stop.

While still at the bus stop before the bus arrived, Sanchez texted her boyfriend, Jesus, and told him that Nunez had slapped her.

C.    *Second Incident — September 25, 2012, 6:00 p.m. Near the Bus Stop*

Sanchez took the bus and got off at the stop nearest Jesus's house, arriving approximately 10-15 minutes after Nunez had slapped her. As she was walking toward the house, Sanchez met up with Jesus and one of his brothers, Juan, who were on their way to pick her up.[5] Jesus was concerned and worried about Sanchez. Once they met, Sanchez explained in more detail what had happened at the bus stop, and Jesus saw the result of Nunez's physical attack on Sanchez. Jesus quickly arranged for the three of them to get a ride back to the area where Nunez had slapped Sanchez so that they could look for him.

As Sanchez, Jesus and Juan walked around, Sanchez heard a whistle and a honk and saw the same car that Nunez had been driving when he pulled over at the bus stop approximately one hour earlier. Nunez and four to seven other men emerged from the car with bats, knives, crowbars and pipes; they approached Sanchez, Jesus and Juan.

---

[5]    Jesus was carrying a military style knife in a holster on his belt. Juan was not armed. Neither Jesus nor Juan was a gang member.

Nunez, who was holding the same knife as before, went straight for Sanchez and flipped the knife within inches of her face. Sanchez was so scared that she opened the door of a passing vehicle to ask for help.

Meanwhile, one group of Nunez's friends surrounded Juan, striking him with their weapons; and another two of the friends attempted unsuccessfully to strike Jesus, eventually running when he took out his knife. Nunez then turned away from Sanchez and joined the group attacking Juan, stabbing him in the chest with the open knife he still held. Juan died from the stab wound, which had penetrated his lung.

D.      *The Trial*

Nunez was charged with the murder of Juan and the assault with a deadly weapon of Sanchez. The trial lasted nine days.

The jury convicted Nunez of the second degree murder of Juan and the assault with a deadly weapon of Sanchez, finding true the allegations that Nunez personally used a deadly and dangerous weapon in the commission of the murder and that he committed both the murder and the assault for the benefit of and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members.

II.

DISCUSSION

On appeal, Nunez argues that the evidence was insufficient to convict him of an assault with a deadly weapon on Sanchez and that the abstract of judgment should be

corrected in two regards.  As we explain *post*, we disagree with the first argument and agree with the second argument.

A.   *The Record Contains Substantial Evidence That Nunez Acted in a Manner That Would Naturally and Probably Result in a Battery*

Nunez was convicted of "commit[ting] an assault upon the person of another with a deadly weapon or instrument other than a firearm."  (§ 245, subd. (a)(1).)  In this context, an assault "is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  (§ 240.)

An assault does not require a specific intent to cause a physical injury or a subjective awareness that a physical injury might occur.  (*People v. Williams* (2001) 26 Cal.4th 779, 790 (*Williams*).)  Rather, as applicable to the issue on appeal, our Supreme Court has held that an assault "only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will *probably and directly result in the application of physical force against another*."  (*Ibid.*, italics added; see *id.* at pp. 782, 784, 788.)  In *Williams*, the court reaffirmed its statement in *People v. Colantuono* (1994) 7 Cal.4th 206 (*Colantuono*) that "the mental state for assault . . . is established upon proof the defendant willfully committed an act that by its nature will *probably and directly result in injury to another*, i.e., a battery."  (*Id.* at p. 214, italics added; see *Williams*, at pp. 782, 787.)

Consistently, based on CALCRIM No. 975, the court instructed the jury as follows with regard to assault with a deadly weapon under section 245, subdivision (a)(1):  "To prove that [Nunez] is guilty of this crime, the People must prove that:  [¶]  1. [Nunez] did

7

an act with a deadly weapon . . . that by its nature would *directly and probably result in the application of force to a person*; [¶] . . . [¶] 3. When [Nunez] acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would *directly and probably result in the application of force to someone . . . .*"  (Italics added.)

On appeal, Nunez challenges the sufficiency of the evidence to support the requisite finding that his act(s) "directly and probably" would have resulted in injury to Sanchez.  Indeed, Nunez contends there is *no evidence* that he committed *any* act that "directly and probably" would have resulted in the application of force, arguing instead that he "simply brandish[ed] the knife near [Sanchez] in order to scare her."[6]

As we consider Nunez's argument in the context of the evidence in the record on appeal, we are mindful that "[s]ubstantial evidence is evidence which is ' "reasonable in nature, credible, and of solid value." ' "  (*People v. Medina* (2009) 46 Cal.4th 913, 919.) " 'Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.' "  (*People v. Fuiava* (2012) 53 Cal.4th 622, 711.)  Also, we must accept all logical inferences that the jury might have drawn from the evidence.  (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)

---

6    Webster's Third New International Dictionary (2002) defines "brandish" as "to shake or wave (a weapon) menacingly."  (*Id.* at p. 268, col. 2.)  The crime of brandishing consists of "draw[ing] or exhibit[ing]," in the presence of another person, other than in self defense, "any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel . . . ."  (§ 417, subd. (a)(1).)

8

In reviewing a challenge to the sufficiency of the evidence, we review the entire record in order to determine "whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432; see *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [our function is to determine if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (italics added)].) In making this determination, we "consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*Mincey*, at p. 432.)

As we described at parts I.B. & I.C., *ante*, there were two separate incidents at which Nunez acted willfully with a deadly weapon in Sanchez's presence — one at the bus stop at approximately 5:00 p.m. on September 25, 2012, and one approximately an hour later near the same bus stop. In closing argument, the prosecutor argued that *either* incident was sufficient to support a guilty verdict on the assault charge.[7] We agree.

The second incident is the clearest. Initially, we place in context Nunez's acts near the bus stop: Approximately one hour earlier at the bus stop, Nunez had approached

---

[7]    The court had instructed the jury on unanimity: "The defendant is charged in Count 2 with the crime of assault with a deadly weapon in violation of Penal Code [s]ection 254[, subdivision ](a)(1) on or about September 25, 2012. As to this count, the People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless all of you agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed." (See CALCRIM No. 3500.)

Sanchez with an open butterfly knife at his side, identified himself as an Otay gang member and slapped her across the face with "all his force," causing her lip piercing and earrings to come out and her face to swell. An hour later, near the bus stop, the same car that Nunez had been driving pulled over to the curb, and five to eight men with weapons jumped out "next to" Sanchez. Nunez "quickly" went "straight toward[ Sanchez]" with an open butterfly knife, "flipping it in [her] face," just "inches" from her skin. Sanchez "was scared" and thought "that he was going to stab [her]." Finally, the jury reasonably could have inferred that Nunez's aggressive acts toward Sanchez would have continued had Sanchez not stopped a passing vehicle to ask for help, thereby distracting Nunez enough to turn his attention to Juan. One minute Nunez was flipping his knife within inches of Sanchez's face, and the next minute Nunez had stabbed and killed Juan with the knife.

Similarly, the first incident at the bus stop was also sufficient to support a guilty verdict on the assault charge. There, Nunez — whom Sanchez did not recognize at first — got out of a car, approached Sanchez "in an aggressive way" with an open butterfly knife at his side, identified himself as an Otay gang member and slapped her across the face with "all his force," causing her lip piercing and earrings to come out and her face to swell. Even before Nunez slapped her, Sanchez was "scared." Fearing that he was going stab her with the open knife — and standing close enough that he was able to slap her face — Sanchez begged Nunez not to stab her. Finally, the jury reasonably could have inferred that Nunez's aggressive act toward Sanchez would have continued had Nunez's

10

friends in the car not interrupted him by yelling "fuck Chupa" and telling Nunez to get into the car after he had slapped Sanchez.

While Nunez acknowledges most of the facts we have discussed, he contends that they amounted only to "fright[]" or "mere menace" — standards insufficient to support a conviction of assault under *People v. Wolcott* (1983) 34 Cal.3d 92, 99 (assault may not be based on " 'intent only to frighten' ") and *People v. Yslas* (1865) 27 Cal. 630, 633 ("something more than a mere menace" needed to constitute assault). The distinction, as explained by our Supreme Court, is that, in order to constitute an assault, "[t]here must be violence begun to be executed. But where there is a clear intent to commit violence accompanied by acts which if not interrupted will be followed by personal injury, the violence is commenced and the assault is complete." (*Yslas*, at p. 633.) Given this distinction, we disagree with Nunez's suggestion that he merely brandished a knife without evidence that the act likely would have culminated in an injury to Sanchez. To the contrary, in both incidents Nunez's violence had begun, but in both incidents Nunez was interrupted before he could physically injure Sanchez with the knife.

Accordingly, we have no difficulty concluding that — in each of the incidents — the record contains substantial evidence of Nunez's intentional act that "by its nature w[ould] *probably and directly result in the application of physical force against another.*" (*Williams*, *supra*, 26 Cal.4th at p. 790, italics added; see *Colantuono*, *supra*, 7 Cal.4th p. 214; CALCRIM No. 875.)

11

B.    *The Abstract of Judgment Should Be Corrected*

Rubio was charged as a codefendant with Nunez in the original complaint and the original information.  Rubio pled guilty shortly before Nunez went to trial.  At Nunez's sentencing hearing, the court ordered that all restitution was to be paid "jointly and severally with codefendant Alex Rubio."  However, the abstract of judgment contains no such statement.  The Attorney General agrees that the abstract of judgment does not accurately reflect the court's order that Nunez and Rubio are jointly and severally responsible for the restitution.

The abstract of judgment indicates that Nunez's conviction for assault with a deadly weapon is for a violent felony.  Nunez argues that section 667.5, subdivision (c) contains a list of " 'violent felon[ies]' " for which an enhancement shall be imposed, yet a violation of section 245, subdivision (a)(1) is not one of the specifically enumerated crimes.  Nunez requests that the abstract of judgment be corrected.  The Attorney General agrees that assault with a deadly weapon (§ 245, subd. (a)(1)) is not a violent felony for purposes of the designation on the abstract of judgment.

We independently have reviewed the record and agree that the abstract of judgment should be amended in both regards.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate court may order correction of abstract of judgment that does not accurately reflect oral judgment of sentencing court].)

12

DISPOSITION

The judgment is affirmed. The superior court is directed (1) to amend the abstract of judgment to specify that the direct victim restitution is a joint and several obligation of Nunez and his codefendant Alex Flores Rubio; (2) to amend the abstract of judgment to remove the designation that Nunez's conviction of section 245, subdivision (a)(1) is a violent felony; and (3) to forward the amended abstract of judgment to the Department of Corrections.

IRION, J.

WE CONCUR:


O'ROURKE, Acting P. J.


AARON, J.

13